# IN THE COURT OF APPEALS OF IOWA

No. 23-1235
Filed July 23, 2025

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**CHRISTOPHER ROBERT MOYLE,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Woodbury County, Jeffrey Neary, Judge.

A defendant appeals his conviction and sentence for stalking. **AFFIRMED.**

Leah Patton (argued) of Patton Legal Services, LLC, Ames, for appellant.

Brenna Bird, Attorney General, and Linda J. Hines (argued) and David Banta, Assistant Attorneys General, for appellee.

Heard at oral argument by Greer, P.J., and Badding and Chicchelly, JJ.

**BADDING, Judge.**

Following a four-month spree of violent text messages and unwelcome visits to his ex-wife's workplace, the State charged Christopher Moyle with stalking in violation of Iowa Code section 708.11(3)(b)(1) (2021).  A jury found Moyle guilty, and the district court sentenced him to a term of imprisonment.  In this appeal, Moyle challenges the admission of evidence about a prior episode of harassment and his criminal convictions arising from that incident.  He also challenges the sufficiency of the evidence supporting his conviction and the court's rejection of his request for a suspended sentence.  We affirm.

**I.      Background Facts and Proceedings**

In 2019, Moyle learned his youngest daughter was not his biological child, driving a wedge through his nine-year marriage.  According to his ex-wife,[1] Moyle grew "mentally abusive" in the wake of the discovery.  The couple separated in March 2020.  Over the next two years, Moyle incurred several criminal charges for his abusive behavior.  Two sets of conduct are at issue in this appeal: (1) an episode in July 2020 in which Moyle threatened his wife and later pled guilty to three offenses; and (2) a series of contacts between August and December 2021 that led to the stalking conviction at issue.

**A.      July 2020 Incident**

On July 6, 2020, Moyle sent a series of threatening text messages to his ex-wife.  She recalled him stating, among other things, that "the kids would be

---

[1] The couple was estranged but still married during part of the period relevant to this case.  For ease of reference, and to protect the victim's privacy, we will refer to her as Moyle's "ex-wife" throughout this opinion.

better off if [she] was dead." Scared by these messages, Moyle's ex-wife went to the courthouse to seek a protective order. When Moyle learned that she was at the courthouse, he texted that there "would be a blood bath" and that "[h]e didn't care who he took out . . . as long as he took [her] out with them." Then he sent her a picture of her vehicle at the courthouse with a message stating, "go ahead and send them out." His ex-wife interpreted that as a threat against her life.

Police arrested Moyle near the courthouse. Inside his vehicle, they found a rifle and what Moyle's ex-wife described as a "homemade bomb."[2] Moyle was charged with domestic abuse assault, first-degree harassment, and possession of explosive or incendiary materials or devices. The district court entered a no-contact order prohibiting Moyle from communicating with his ex-wife, threatening her, or appearing at her "residence or place of employment." Moyle later pled guilty to all three charges and was sentenced to concurrent terms of imprisonment. The sentencing order also extended the no-contact requirement for five years.

## B.    Conduct Charged in this Case

Moyle was released from prison in August 2021. On August 27, he sent a text message to his ex-wife asking for personal papers he left at their home that he needed to obtain employment. Moyle's ex-wife responded, although she noted they "[weren't] supposed to be talking." The conversation quickly turned to the pending dissolution and Moyle's desire to see their girls. He asked his ex-wife to bring them to a park for a visit. When she declined to set a date, Moyle's messages

---

[2] According to Moyle, the latter item was "improperly stored gun powder" with "no ignition mechanism." But at trial, he testified that he used the powder to "blow up . . . woodchuck hole[s]."

grew violent. He told his ex-wife that he was "ready for this life to be over," that he would have already "done it" but for his hope to reunite with the girls, and that "if I lose them I'm going to go out big."

On September 8, Moyle informed his ex-wife that he intended to see the girls with or without her consent, that he was "coming to get them," and that he knew "everywhere [she had] to take them." Moyle's ex-wife was alarmed by these messages. The next day, she obtained a temporary civil protective order placing the children in her custody and prohibiting Moyle from contacting her or the children pending a hearing. Moyle missed that hearing, and the court entered a final protective order effective for one year. Between September and November, Moyle sent his ex-wife several strings of texts stating that he planned to commit suicide due to his separation from the children. Other messages stated that he had a "9mil on the way . . . [n]ot for you but for me" and that "there's nothing these . . . cops and courts can do to stop me."

After their divorce was finalized in October 2021, Moyle began making unannounced visits to the paint store where his ex-wife worked. On November 23, he drove to the store, pulled into the parking lot, and directed an "evil eye" stare toward an employee who was eating lunch. Moyle's ex-wife was scheduled to work, but she had stayed home sick that day.[3] Her coworker called her to tell her that Moyle had visited the store.

---

[3] Moyle's ex-wife testified at trial that Moyle knew her schedule because she worked the same hours during their marriage. Moyle conceded that he "generally" knew when his ex-wife worked.

On December 9, Moyle's ex-wife was in the store parking lot when Moyle pulled in, approached her with his vehicle, and stared silently before driving away. She called the police. Nine days later, on December 18, Moyle's ex-wife was closing the store when she spotted Moyle again—this time in the parking lot of the fast-food restaurant across the street. Moyle rolled down his window and stared toward the store. She thought she saw him twirling something in his hand. Moyle's ex-wife called 911 again, and police arrested Moyle near the restaurant.

## C. Procedural History

The State charged Moyle with stalking while subject to the restrictions of a civil or criminal protective order, a class "D" felony, in violation of Iowa Code section 708.11(3)(b)(1). Prior to trial, Moyle filed a motion in limine asking the district court to prohibit the State from referring to his prior convictions at trial.[4] Because his enhanced stalking charged required the State to prove the existence of a protective order, Moyle offered to stipulate that, "during December 2021," a no-contact order was in effect between Moyle and his ex-wife. The State resisted, arguing that Moyle's proposed stipulation was "devoid of any context" and that evidence about his July 2020 offenses was relevant to provide his "knowledge that the victim would reasonably be placed in fear by his actions."

Acknowledging the need to balance Moyle's prejudice concerns against the State's burden of proof, the district court denied Moyle's pretrial request to exclude evidence of his prior convictions but granted him a standing objection. At trial, the

---

[4] A second motion in limine sought to exclude, among other things, any evidence "regarding the Defendant's criminal record of charges, convictions, and allegations of uncharged criminal behavior," including "statements that the Defendant had a history of doing similar acts."

State described Moyle's prior convictions in its opening and closing statements. It also elicited testimony from Moyle's ex-wife about his text messages on July 6, 2020, and the incident that unfolded outside the courthouse. And the State offered the criminal no-contact order, civil protective orders, and criminal sentencing order into evidence, which the court allowed over Moyle's standing objection. The jury found Moyle guilty as charged, and the court sentenced him to a term of imprisonment. This appeal followed.

## II.     Analysis

### A.     Prior Bad Acts

Moyle asserts the district court abused its discretion when it allowed the State to introduce "lengthy and detailed testimony" about Moyle's actions on July 6, 2020, specifically the "prior convictions for domestic abuse assault, harassment, and possession of an incendiary device, facts underlying those convictions, and the sentences for the convictions."[5] The State concedes preservation of error, acknowledging the district court's "unequivocal ruling" on Moyle's pretrial request to exclude this evidence.[6]

The district court's ruling was not as definitive as the parties suggest. The court remarked it would "be attentive to the concerns throughout trial," leaving the door open to further ruling. Nevertheless, the court granted Moyle a standing objection covering "matters related to prior bad acts." Moyle re-asserted his

---

[5] Moyle does not challenge the admission of the criminal no-contact order or the September 2021 civil protective orders as exhibits.

[6] The State contests preservation of error "[t]o the extent Moyle contends exhibits should have been redacted" and "to the extent Moyle claims the district court abused its discretion because it did not submit a cautionary instruction." These issues are addressed below.

objection during opening statements at trial, and the court incorporated the "previous record" before admitting exhibits describing Moyle's prior criminal proceedings. "As our supreme court has noted, although a 'standing objection may save trial time and be convenient for both court and counsel, it makes appellate review infinitely more difficult and, for the litigants, more uncertain.'" *State v. Juste*, 939 N.W.2d 664, 672 (Iowa Ct. App. 2019) (quoting *State v. Jeffs*, 246 N.W.2d 913, 916 (Iowa 1976)). As a result, "standing objections are not a favored trial practice." *Id.* While this case is not a model for error preservation, we find that Moyle's evidentiary claim was raised in and decided by the district court, so we can reach its merits on appeal. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002).

"In considering whether the trial court properly admitted prior-bad-acts evidence, we apply an abuse-of-discretion standard of review." *State v. Taylor*, 689 N.W.2d 116, 124 (Iowa 2004); *accord State v. Thoren*, 970 N.W.2d 611, 620 (Iowa 2022). "A district court abuses its discretion when it bases its decisions on grounds or reasons clearly untenable or to an extent that is clearly unreasonable," including when the court "bases its conclusions on an erroneous application of the law." *Thoren*, 970 N.W.2d at 620 (citation omitted).

Under Iowa Rule of Evidence 5.404, evidence of a prior crime, wrong, or other bad act "is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Iowa R. Evid. 5.404(b)(1). However, proof of a prior wrong "may be admissible for another purpose such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Iowa R.

Evid. 5.404(b)(2). To fall within this exception, "the evidence must be relevant and material to a legitimate issue in the case other than a general propensity to commit wrongful acts." *State v. Sullivan*, 679 N.W.2d 19, 25 (Iowa 2004). It is the State's burden to "articulate a valid, noncharacter theory of admissibility." *Thoren*, 970 N.W.2d at 625 (citation omitted).[7] Here, the State argued that evidence of Moyle's prior offenses was relevant to contextualize the parties' relationship and establish the mens rea elements of Moyle's stalking charge.

Under the marshaling instruction given to the jury, the State was required to show that Moyle "purposefully engaged" in a course of conduct that he "knew or should have known" would cause a reasonable person to fear bodily injury or death to his ex-wife. Moyle has never disputed the purposeful nature of his text messages and visits to the paint store. But he did challenge the State's allegation that he knew this behavior was threatening. At trial, he alleged that his texts between August and December 2021 were innocent—"All's I wanted was to see the kids. I didn't care about anything else." And he claimed that each of his appearances at his ex-wife's workplace were either innocuous or coincidental.

Thus, the knowledge element of Moyle's stalking charge was a "legitimate issue in the case," *Sullivan*, 679 N.W.2d at 25, and the State was entitled to introduce evidence rebutting Moyle's defense. To that end, Moyle's prior offenses were probative because they made it more likely that Moyle knew or should have known his conduct could be reasonably perceived as a threat of physical harm.

---

[7] As another prerequisite to admission of prior-bad-acts evidence under rule 5.404(b)(2), the State must present "clear proof the individual against whom the evidence is offered committed the bad act." *Sullivan*, 679 N.W.2d at 25. There is no dispute that Moyle did, in fact, commit the prior offenses here.

*See State v. Helmers*, 753 N.W.2d 565, 570 (Iowa 2008) (explaining that "[i]solated instances of unwelcome conduct may not appear to a fact finder to be frightening," but "that view may change once the pattern of conduct . . . [is] revealed"); *State v. Rodriquez*, 636 N.W.2d 234, 242 (Iowa 2001) (noting that a defendant's prior violence against the same intimate partner made it "more probable that his [newly charged conduct] was intended—and perceived—to be a threat of harm" for purposes of his kidnapping charge); *State v. Bonert*, No. 11-1677, 2012 WL 4550851, at *2 (Iowa Ct. App. Oct. 3, 2012) (finding prior interactions between a defendant and victim highly relevant in the "unique context of a stalking trial, where . . . the defendant's awareness of the person's likely reaction" is an element to be proved). The district court correctly determined that Moyle's previous behavior toward his ex-wife was relevant to prove his knowledge.

Even when prior-bad-acts evidence is admissible for a non-propensity purpose, the court still must consider whether "its probative value is substantially outweighed by the danger of unfair prejudice to the defendant." *Sullivan*, 679 N.W.2d at 25 (citing Iowa R. Evid. 5.403). Some amount of prejudice is "inherent in prior-bad-acts evidence"—the pertinent question is whether the prejudice is disproportionate and unfair. *Taylor*, 689 N.W.2d at 130. Unfair prejudice arises when evidence incites "a jury to base its decision on something other than the established propositions in the case," such as a "sense of horror" or "instinct to punish." *Rodriquez*, 636 N.W.2d at 240 (citation omitted). Among other factors, courts consider the need for the evidence given other proof available to the State and the "degree to which the fact finder will be prompted to decide the case on an improper basis." *Taylor*, 689 N.W.2d at 124.

Moyle argues the evidence of his prior offenses was unnecessary because "other evidence was available and admitted at trial to establish the relationship between the parties and [Moyle's] motive and intent." Moyle also argues that "the State elicited extensive argument, testimony, and evidence regarding the prior convictions," which "permeated the entire trial and became the focal point in its effort to prove the stalking elements." But the record shows otherwise. The State's evidence about Moyle's July 2020 conduct was initially confined to the succinct testimony of Moyle's ex-wife and two exhibits—the no-contact order entered after Moyle's arrest and the sentencing order from his prior criminal case. The State revisited the prior offenses during its cross-examination of Moyle, but only after he tried to disavow the facts supporting his guilty plea.

Contrary to Moyle's arguments, the State's evidence describing his prior offenses against his ex-wife was neither unnecessary nor unfair. Moyle's primary defense at trial was to suggest his conduct between August and December 2021 was never meant—and could not reasonably be perceived—to be threatening. The State was entitled to prove its own narrative: that Moyle's messages and visits to the paint shop were acts of knowing intimidation. Moyle's admitted assault and harassment against his ex-wife under similar circumstances was highly relevant to that theory. Excluding this evidence would have arguably interfered with the truth-finding function of trial. *See id.* at 130 (noting a defendant is not "entitled to have the jury determine his guilt or innocence on a false presentation that his and the victim's relationship [was] peaceful and friendly" (citation omitted)).

Moyle alternatively argues that, even if his prior convictions were appropriately admitted, the district court should not have allowed the jury to learn

he was sentenced to prison for these offenses. He contends this information invited the jury to punish him for "not learn[ing] his lesson," and he claims that the court erred by not requiring the State to redact references to Moyle's prison sentence in the sentencing order it introduced at trial.[8] However, Moyle never raised this more narrowly tailored objection before or during trial. Under this court's familiar error-preservation principles, "neither the state nor the defendant can raise a new claim or defense on appeal that could have been, but failed to be, raised at trial." *State v. Dessinger*, 958 N.W.2d 590, 598 (Iowa 2021) (explaining a "specific objection to the admission of evidence" must be raised at trial in order to be preserved for appeal). Because Moyle failed to assert his objection to the prior-sentence evidence at trial, it is not preserved for review.[9]

Moyle also contends the district court erred by failing to give a limiting instruction that could have reduced the risk of prejudice from his prior convictions. It is true that these instructions can be an "antidote for the danger of prejudice" when prior-bad-acts evidence is admitted. *State v. Putman*, 848 N.W.2d 1, 15 (Iowa 2014). But Moyle did not request one. Although the Iowa Supreme Court has encouraged trial judges to administer limiting instructions "even if not specifically requested by the defendant," *Rodriquez*, 636 N.W.2d at 243 n.2, Moyle cites no authority suggesting that a failure to do so amounts to an abuse of discretion. Such a rule would conflict with the general requirement that a party

---

[8] Moyle also argues that the court improperly admitted "witness testimony on this topic." But it was Moyle—not the State—who elicited testimony about his prison service.

[9] Our resolution of this issue on error preservation grounds should not, however, be taken as approval of the admission of evidence about a defendant's prison sentence for past offenses.

must first request an excluded instruction to preserve a challenge for appeal. *State v. Davis*, 951 N.W.2d 8, 16 (Iowa 2020).

In the end, determining the admissibility of prior-bad-acts evidence "is not an exact science, so we generally give a great deal of leeway to the trial judge who must make this judgment call." *Thoren*, 970 N.W.2d at 635 (cleaned up). For the foregoing reasons, we detect no abuse of discretion on the evidentiary claim preserved for our review.

### B. Sufficiency of the Evidence

Moyle next challenges the sufficiency of the evidence supporting his guilty verdict. In considering such a claim, which we review for the correction of errors at law, this court does not reweigh the evidence or resolve questions of credibility—"such matters are for the jury." *State v. Brimmer*, 983 N.W.2d 247, 256 (Iowa 2022) (citation omitted). Our only task is to determine whether substantial evidence supports the jury's conclusion. *State v. Sanford*, 814 N.W.2d 611, 615 (Iowa 2012). "Inherent in our standard of review of jury verdicts in criminal cases is the recognition that the jury is free to reject certain evidence, and credit other evidence." *Id.* (cleaned up).

Moyle does not challenge the district court's marshaling instruction, which establishes the law of the case for our sufficiency-of-the-evidence review. *See State v. Schwartz*, 7 N.W.3d 756, 764 (Iowa 2024). Under that instruction, the State had to prove these elements:

> 1. On or about the 27th day of August, 2021 to on or about December 18, 2021, the defendant purposefully engaged in a course of conduct directed at [Moyle's ex-wife] that would cause a reasonable person to fear bodily injury to, or the death of [Moyle's ex-wife].

2. The defendant knew or should have known that [Moyle's ex-wife] would be placed in reasonable fear of bodily injury or death to [Moyle's ex-wife].
3. The defendant's course of conduct caused [Moyle's ex-wife] to fear bodily injury or death to [Moyle's ex-wife].

The jury was also instructed that "course of conduct" means "repeatedly maintaining a visual or physical proximity to a person without legitimate purpose or repeatedly conveying oral or written threats, threats implied by conduct, or a combination of the two, directed at or toward a person." "Repeatedly" was defined to mean "two or more occasions."

Moyle asserts that the State's evidence fell short with respect to all three elements of his stalking charge. He primarily contends that he had "legitimate reasons" to appear at his ex-wife's workplace on each of the occasions at issue. But he testified about those reasons at trial, and each conflicted with other evidence presented by the State.[10] It was up to the jury "to decide which evidence to accept." *Brimmer*, 983 N.W.2d at 256. In any event, "physical proximity . . . without legitimate purpose" was just one type of behavior the State could show to establish a "course of conduct." Repeated "threats implied by conduct" were another. And because the State was not required to show Moyle specifically intended to frighten his ex-wife, *Neuzil*, 589 N.W.2d at 711–12, his subjective reasons for his behavior are of limited relevance.

_____

[10] For instance, Moyle testified he visited the store on November 23 to drop off a necklace and bracelet for his daughters, which he left in an envelope with his ex-wife's boss; but his ex-wife testified that she did not recall receiving these gifts. Moyle also testified that he came to the store on December 9 at his ex-wife's request to discuss fixing her car, but his ex-wife testified that Moyle "just stared" at her that day. And Moyle testified that, on December 18, he was parked at the fast-food restaurant while waiting for his brother to finish at the drive-through; but he did not mention his brother when explaining his presence to police.

More to the point, Moyle contends that none of the text messages introduced at trial expressly threatened to harm his ex-wife. But "making a threat is not an element of our stalking statute." *State v. Evans*, 671 N.W.2d 720, 726 (Iowa 2003). He also suggests that driving through the parking lot of his ex-wife's workplace and parking his vehicle at the restaurant across the street are not activities that would put a reasonable person in fear of bodily injury or death. To accept these arguments, the jury would have to ignore Moyle's offenses in July 2020, which he concedes were "substantially similar" to his actions here. Moyle's prior threats under like circumstances lend an undertone of violence to his conduct here. After all, the last time Moyle appeared where his ex-wife was not expecting him, he was armed with a rifle and gun powder. *See State v. Limbrecht*, 600 N.W.2d 316, 319 (Iowa 1999) (finding substantial evidence that a defendant's unsolicited letters and "drive-bys" were objectively threatening given the victim's familiarity with his criminal record, noting "what might be considered a harmless infatuation in another context assumed frightening proportions here"); *Bonert*, 2012 WL 4550851, at *5 (finding a defendant's drive-bys past the victim's residence could cause a reasonable person fear when accounting for the history of domestic violence between the parties). The jury could find that a reasonable person would fear physical harm under these circumstances.[11]

---

[11] Moyle's text messages added another layer of intimidation by conveying his disregard for the parties' protective order. Among other texts, Moyle wrote that "papers mean nothing" and "I refuse to recognize the authority of any judge in this district." Moyle's ex-wife testified that his attitude toward these legal protections made her worry that nothing would stop Moyle from causing her harm.

Substantial evidence also supports the other two elements of Moyle's offense. As discussed above, Moyle's previous convictions for similar contacts with his ex-wife support an inference that he knew or should have known his behavior was threatening. *See Bonert*, 2012 WL 4550851, at *2. The no-contact orders in effect at the time of Moyle's visits to the store reinforce this inference. *See Helmers*, 753 N.W.2d at 568 (noting a no-contact order is "a key piece of evidence" showing that a defendant was aware his course of conduct could place the victim in reasonable fear of bodily injury); *Neuzil*, 589 N.W.2d at 712 ("A stalker should know that his actions are unappreciated if he was served with a court order . . . ."). And the jury heard ample evidence that Moyle's ex-wife did, in fact, fear harm. She testified that she was "terrified," "scared," and "froze[n]" with apprehension upon seeing her ex-husband, unsure "what he was going to do or what his purpose was." She also called the police in response to both appearances.

Taking the record in the light most favorable to the State, we find substantial evidence supports each element of Moyle's conviction. We accordingly affirm on this issue.

## C. Sentencing Discretion

For his third claim of error, Moyle contends the district court abused its discretion by sentencing him to a term of imprisonment rather than probation. He argues the court failed to address several mitigating factors: his age, limited criminal history, employability, family support, release plan, history of traumatic experiences, and veteran status. He also repeats that he made "[n]o actual physical threats of harm." According to Moyle, "[i]f the trial court had properly

weighed and considered" these factors, "it would have concluded that prison was not appropriate, and probation was warranted."

The district court's sentence of up to five years in prison was within the statutory range for Moyle's class "D" offense.  *See* Iowa Code §§ 708.11(3)(b)(1), 902.9(1)(e) (2021).  So it is "cloaked with a strong presumption in its favor, and will only be overturned for an abuse of discretion or the consideration of inappropriate matters."  *State v. Wilbourn*, 974 N.W.2d 58, 65 (Iowa 2022) (citation omitted).  Addressing Moyle at the sentencing hearing, the court explained that its decision to sentence him to a term of imprisonment was based on its concerns for community protection and Moyle's recidivism:

> I believe [defense counsel's] description generally is accurate about the limited contact with law enforcement, but you do have a prior prison sentence.  It was on a two-year sentence.  It was on something that related to some similar-type behavior and activity.  This is just another more serious round of that kind of thing.  So I ultimately think that I would be doing the community a disservice if I didn't sentence you to prison.

Moyle does not deny the propriety of these considerations, and rightly so. *See* Iowa Code § 901.5 (requiring the court to fashion a sentence providing "maximum opportunity for the rehabilitation of the defendant, and for the protection of the community").  He simply contends the district court assigned them too much weight.  But we do not second-guess such decisions.  *See State v. Damme*, 944 N.W.2d 98, 106 (Iowa 2020).  The "right of an individual judge to balance the relevant factors in determining an appropriate sentence inheres in the discretionary standard."  *State v. Wright*, 340 N.W.2d 590, 593 (Iowa 1983).  And the court was not "required to specifically acknowledge each claim of mitigation urged" by Moyle.

*State v. Boltz*, 542 N.W.2d 9, 11 (Iowa Ct. App. 1995). As a result, we find no abuse of discretion in the court's sentencing decision.

**AFFIRMED.**